UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

THE TOWERS, LLC d/b/a VERTICAL BRIDGE

*Plaintiff,*

*v.*

TOWN OF CONWAY, NEW HAMPSHIRE; ZONING BOARD OF ADJUSTMENT OF THE TOWN OF CONWAY, NEW HAMPSHIRE; and THE PLANNING BOARD OF THE TOWN OF CONWAY, NEW HAMPSHIRE

*Defendants.*

**Civil Action No. 1:26-cv-987**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**AND EXPEDITED REVIEW UNDER 47 U.S.C. § 332(c)(7)(B)(v)**

Plaintiff THE TOWERS, LLC d/b/a VERTICAL BRIDGE ("Vertical Bridge" or "Plaintiff") on behalf of itself and for the benefit of Bell Atlantic Mobile Systems LLC d/b/a Verizon Wireless ("Verizon"), by and through its attorneys Nixon Peabody LLP, hereby submits this Complaint against defendants the TOWN OF CONWAY, NEW HAMPSHIRE (the "Town"), ZONING BOARD OF ADJUSTMENT OF THE TOWN OF CONWAY, NEW HAMPSHIRE (the "ZBA"), and PLANNING BOARD OF THE TOWN OF CONWAY, NEW HAMPSHIRE (the "Planning Board," and collectively with the ZBA and the Planning Board, the "Defendants"), and respectfully alleges as follows:

## Nature of the Action

1. This action arises out of the ZBA's unlawful denial of Plaintiff's application for special exceptions to construct a personal wireless communications facility for Verizon, a

wireless telecommunications licensee of the Federal Communications Commission ("FCC"), in order to remedy a significant gap in coverage and capacity in Verizon's wireless network along Route 302 (White Mountain Highway), which carries approximately 17,000 vehicles per day; West Side Road, which carries approximately 3,700 vehicles per day; and River Road, which carries approximately 4,500 vehicles per day, as well as the surrounding roads, neighborhoods, and businesses (the "Significant Gap") in the Town of Conway ("Conway"). The proposed project, as last modified during the ZBA proceedings, consists of a 130-foot Corten steel monopole wireless telecommunications facility with a four-foot lightning rod within a 50' x 50' fenced compound, together with a driveway and other site improvements (the "Project"), located at 2699 West Side Road (PID 217-23) in Conway, New Hampshire (the "Property"). A copy of the ZBA's Notice of Decision in Case No. 26-10 dated October 22, 2026 (the "Written Decision") is attached to this Complaint as Exhibit 1.

2. The Written Decision violates § 332(c)(7)(B)(iii) of the federal Communications Act of 1934, as amended by the Telecommunications Act of 1996 (the "TCA") because the denial is not supported by substantial evidence contained in a written record.

3. The Written Decision also results in an effective prohibition of personal wireless services in Conway. Accordingly, the ZBA's denial of Plaintiff's application violates §§ 253(a) and 332(c)(7)(B)(i)(II) of the TCA.

4. Each violation warrants reversal of the denial and injunctive relief directing the Town to issue all required approvals. Plaintiff seeks an order from this Court directing the ZBA to grant the special exceptions, the Planning Board to approve the site plan and record it in the Carroll County Registry of Deeds, and the Town to issue all necessary permits for the construction and operation of the Project.

5. Pursuant to 47 U.S.C. § 332(c)(7)(B)(v) of the TCA ("[t]he court shall hear and decide such action on an expedited basis"), Plaintiff asserts entitlement to expedited treatment of this Complaint.

## The Parties

6. Plaintiff Vertical Bridge is a limited liability company organized under the laws of the State of Delaware and maintains its principal place of business at 22 West Atlantic Avenue, Suite 310, Delray Beach, Florida 33444.

7. Defendant Town is a duly authorized municipality constituted and existing under the laws of the State of New Hampshire, with an address of 23 Main Street, Conway, New Hampshire 03818.

8. The Town, by and through its Board of Selectmen, is responsible for appointing members to the ZBA and Planning Board and manages the prudential affairs of the Town.

9. Defendant ZBA is a duly authorized unit of the Town of Conway, New Hampshire, with an address of 23 Main Street, Conway, New Hampshire 03818.

10. The ZBA has been delegated the authority, among other things, to grant special exceptions under the Municipal Code of the Town of Conway (the "Code").

11. Defendant Planning Board is a duly authorized unit of the Town of Conway, New Hampshire, with an address of 23 Main Street, Conway, New Hampshire 03818.

12. The Planning Board has been delegated the authority, among other things, to review and approve major site plans under the Code.

## Jurisdiction and Venue

13. This Court has subject matter jurisdiction over this action pursuant to: (i) 47 U.S.C. § 332(c)(7)(B)(v) of the TCA, because Plaintiff has been adversely affected and

aggrieved by the ZBA's actions in violation of 47 U.S.C. §§ 332(c)(7)(B)(iii), 332(c)(7)(B)(i)(II), and 253(a); and (ii) 28 U.S.C. § 1331, because this is a civil action that presents federal questions arising under the TCA.

14. This Court also has jurisdiction over this action under 28 U.S.C. § 1337(a) because the federal statutes invoked herein are acts of Congress regulating commerce.

15. This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202. There is a live and justiciable controversy between the parties.

16. This Court has personal jurisdiction over the Defendants because the Defendants are domiciled within the jurisdiction of the United States District Court, District of New Hampshire, and the claims stated herein arose in the same jurisdiction.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims stated herein arose in the judicial district for the United States District Court, District of New Hampshire, and the Defendants are located in this District.

18. Pursuant to 47 U.S.C. § 332(c)(7)(B)(v), this Complaint is timely filed within thirty (30) days of October 22, 2026, the date the ZBA issued the Written Decision unlawfully denying the special exceptions in violation of the TCA.

**The Important Federal Interests at Issue in This Case**

19. As set forth in the TCA, Congress has declared a public need for wireless communication services to be deployed without delay to the public.

20. By enacting the TCA, Congress intended to "provide for a pro-competitive, deregulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunications and information technologies to all Americans." H.R. Rep. No. 104-458, at 206 (1996) (Conf. Rep.); *see* 1996 U.S. Code Cong. and Adm. News, p. 10.

21. Congress implemented specific limitations on the traditional authority of state and local governments, such as requiring local municipalities to act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time,

to "stop local authorities from keeping wireless providers tied up in the hearing process through invocation of state procedures, moratoria, or gimmicks." *Masterpage Commc'ns, Inc. v. Town of Olive,* 418 F. Supp. 2d 66, 77 (N.D.N.Y. 2005) (internal quotations omitted). *See also Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 47 (1st Cir. 2009) ("The [TCA] stresses the need for speedily deploying telecommunications and seeks to get prompt resolution of disputes under the Act . . . . to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.").

22. The FCC regulates the provision of personal wireless and telecommunications service to the public.

23. The FCC grants licenses to providers of personal wireless services to use limited resources, frequencies, and spectrum allocated by the FCC for the provision of such services to the public.

24. These essential wireless services are needed to place those living and passing through the area on equal footing with homes, businesses, and travelers throughout the state who have access to wireless communication and data services, in furtherance of the national policy goal that Congress and the FCC have repeatedly confirmed (i.e., to facilitate the rapid deployment of wireless access so as to ensure that all Americans have access to this critical utility).

25. Moreover, the nation's wireless infrastructure is increasingly replacing traditional wireline phones altogether. It is estimated that over 80% of all 911 calls in the nation are made from cell phones. *See, e.g.*, *9-1-1 Statistics* from NENA.org, the National Emergency Number Association https://www.nena.org/general/custom.asp?page=911statistics#.

26. The TCA imposes a number of procedural and substantive limitations on local zoning decisions to ensure that those decisions do not frustrate the TCA's goals of promoting competition, higher quality services, and the rapid deployment of new telecommunications technologies.

27. Section 253(a) provides that:

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

28. Section 332(c)(7)(B)(i) provides that:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof –
>
> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
>
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

29. The FCC further interpreted "effective prohibition" in its 2018 Declaratory Ruling and Third Report and Order, *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd. 9088, 9104-05 (Sept. 27, 2018), ruling that:

> a state or local legal requirement will have the effect of prohibiting wireless telecommunications services if it materially inhibits the provision of such services. We clarify that an effective prohibition occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service. This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities.

30. Section 332(c)(7)(B)(iii) requires that:

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

31. Section 332(c)(7)(B)(v) provides that:

> Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis....

32. The Project is a “personal wireless service facilit[y]” as defined by the TCA.

33. This action is ripe for determination under the TCA and is timely filed.

**Vertical Bridge**

34. Vertical Bridge is a telecommunications infrastructure developer responsible for developing and managing personal wireless service facilities, as that term is defined in 47 U.S.C. § 332(c)(7)(C)(ii), in strategic locations throughout New England and in many other areas of the country.

35. Vertical Bridge will construct and own the Project for the benefit of Verizon as anchor tenant. The Project is designed to accommodate additional wireless telecommunications providers in the future.

36. Vertical Bridge is authorized to litigate the within claims because Verizon is the specific carrier for which it seeks to build the tower and the application was made in conjunction with Verizon, and thus there is more than “abject speculation” that Verizon is “reasonably likely to lease space on the proposed tower.” *Vertex Towers, LLC v. Zoning Bd. of Adjustment of Town*

*of Hampton, N.H.*, Case No. 24-cv-45-PB-AJ, 2026 DNH 013, 2026 WL 496983, at *6 (D.N.H. Feb. 23, 2026).

37. The Written Decision was a "final action" for purposes of § 332(c)(7)(B)(v) of the TCA. *Omnipoint*, 586 F.3d at 41. However, on November 19, 2026, Vertical Bridge filed a motion for rehearing with the ZBA pursuant to N.H. Rev. Stat. § 677:2 to preserve its state law claims. Vertical Bridge reserves the right to amend this Complaint within thirty (30) days of any rehearing decision.

**Verizon's Network**

38. Verizon is a federally licensed wireless telecommunications provider and is required to have in place a system of strategically deployed cell sites to satisfy its obligations under its FCC license and 47 C.F.R. § 27.14.

39. Wireless telecommunication devices operate by transmitting a very low power radio signal between the wireless telecommunication devices and an antenna mounted on a tower, pole, building, or other structure. The antenna feeds the signal to electronic apparatus located near the antenna, known as a "base station," where it is connected to traditional telephone systems, and is then routed anywhere in the world. The antennas and base station are known as a "cell site."

40. Because of the low power, a cell site is capable of transmitting to and from wireless telecommunication devices only within a limited geographic area. This limited geographic area is called a "cell." A cell site must be located within a prescribed area in order to provide coverage for the entire cell.

41. Wireless telecommunications technology requires that cells overlap somewhat in order to provide uninterrupted service. When the wireless telephone user moves into a new cell,

the transmission is automatically transferred to the cell site in the new cell. If there is no cell site in the new cell, there is no wireless telecommunications service.

42. Because each cell site must be placed in such a manner as to provide service within a particular cell, and so as to provide overlapping (but not duplicate) coverage with the existing or planned cells around it, there is limited flexibility as to where a cell site can be placed. Wireless telecommunications providers conduct a thorough engineering study, including using an elaborate computer program known as a "propagation study." A propagation study shows, based on cell boundaries, topography and other factors, where a cell site needs to be located in order to provide wireless telecommunications coverage in a particular cell. The wireless telecommunication companies and RF engineers identify technologically feasible locations for the cell site within this identified area, known as a "search area."

43. Verizon currently has a service gap in the area surrounding the Project site in Conway (generally herein, the "Mt. Cranmore 2 NH Cell"). Specifically, Verizon determined that much of North Conway is without reliable service, especially along major roads and thoroughfares that support a high volume of traffic. The Project was carefully designed to remedy this service gap in order to improve network quality and reliability for Verizon customers, including emergency services providers traveling along these roads, as well as to the residences, businesses, and visitors in this area. The Project will also offload excess data traffic from other Verizon network sites in the surrounding areas that are currently operating at or near capacity, therefore improving coverage in those areas as well.

**Background Between the Parties**

44. The Property is a 12.85± acre parcel located within the Town's Residential/Agricultural zoning district (the "RA District"). Pursuant to § 190-13K(12) of the

Code, wireless communication facilities are permitted within the RA District by special exception from the ZBA and major site plan approval from the Planning Board. Section 190-13K(12)(b) further requires the applicant to "demonstrate that every reasonable effort has been made to cause the facility to have the least possible visual impact on the Town at large, including demonstration of realistic analysis of multiple sites, the need for the proposed height, and any impact on significant roadside viewpoints."

45. In addition, pursuant to § 190-13E(3) of the Code, the ZBA may grant a special exception allowing a wireless communication facility to exceed 55 feet in height "provided that the height is necessary to fulfill its function."

46. Plaintiff, together with Verizon, submitted an application to the ZBA and the Planning Board for the special exceptions and site plan approval by letter dated May 19, 2026 (together with the supplemental application materials submitted on September 3, 2026 and October 8, 2026, collectively, the "Application").

47. As originally submitted, the Application proposed a 150-foot monopole with a four-foot lightning rod. The Application provided a description of the Project, together with the following exhibits:

- Exhibit A: Completed Town-supplied ZBA and Planning Board application forms;
- Exhibit B: Project description;
- Exhibit C: Applicable legal standards;
- Exhibit D: Proof of compliance with the Code's special exception requirements, including § 190-13K(12) (Exhibit D-1) and § 190-13E (Exhibit D-2);
- Exhibit E: Proof of compliance with the Town's site plan submittal requirements (Exhibit E-1) and driveway requirements (Exhibit E-2);
- Exhibit F: Radio frequency report prepared by C Squared Systems, LLC, including propagation studies ("RF Report");

- Exhibit G: Proof of the landowners' consent to the application (recorded Memorandum of Lease);
- Exhibit H: Copy of Verizon's FCC Licenses;
- Exhibit I: Proof of compliance with federal standards;
- Exhibit J: List of abutting property owners;
- Exhibit K: Twenty-mile radius map pursuant to RSA 12-K:3.IV(b);
- Exhibit L: Driveway sight lines plan and profile;
- Exhibit M: Site selection analysis;
- Exhibit N: List of requested waivers; and
- Exhibit O: Site plan set prepared by ProTerra Design Group, LLC.

48. As more fully demonstrated in the Site Selection Analysis (Exhibit M), there are no existing towers or tall structures suitable for collocation within or near the search area, and nearly 75% of the search area lies within a floodplain overlay. As a result, only six (6) properties in or near the search area were identified as potentially viable, most of which still had significant wetland, floodplain, or existing-use constraints. The owners of four (4) of those six (6) properties did not respond to repeated outreach. The remaining two (2) properties were both owned by the owner of the Property, who would only agree to lease the Property, making the Property the only available site for the Project.

49. In addition to being the only available site, the Property is well suited for a new tower: it sits at an elevation of approximately 516 feet, higher than most of the surrounding area; it is predominantly wooded; and the tower, driveway, and compound are located outside the wetland, watershed protection, and floodplain overlays.

**First Hearing**

50. The ZBA first considered the Application at its June 17, 2026 hearing (the "First Hearing"). At the First Hearing, representatives for Vertical Bridge presented the Project,

including the significant coverage gap the Project would close and why the Property was selected.

51. Vertical Bridge's site acquisition consultant testified regarding the site selection process, explaining that the floodplain significantly constrained the available options and that the Property was the only feasible location for the Project. When asked why Verizon could not collocate on the approved Artist Falls Road tower, Vertical Bridge's representatives explained that collocation there would: (1) place Verizon's equipment too close to its existing Mt. Cranmore site, causing interference with that site's operation; (2) be obstructed by a hill, preventing coverage of the stretch of Route 302 that the Project is designed to serve; and (3) fail to relieve the capacity burden on the Mt. Cranmore and Conway sites.

52. Vertical Bridge's representatives further explained that the Property was the only available and feasible location within the search area for the Project. Wetlands and floodplain areas rendered most of the search area unsuitable for development. Vertical Bridge's site acquisition consultant contacted the owners of each of the remaining viable properties in and around the search area by certified mail, telephone, and email. Only the owner of the Property expressed interest.

53. The Property is large enough to accommodate the 50' x 50' fenced compound without setback relief, and its dense forest cover helps screen the monopole from view. Vertical Bridge's counsel further noted that, even if another site were available in the search area, any other site would require the same two (2) special exceptions for height and use.

54. To assist the ZBA in evaluating the Project's visual impact, Vertical Bridge's representatives also offered to conduct a balloon float and asked the ZBA to identify the locations from which it wanted photographs taken.

55. During the public hearing, the public raised generalized, unsupported concerns about aesthetic impacts, property values, tourism, equipment noise, and human health. Two (2) residents offered anecdotal statements that their own Verizon service was adequate. No member of the public offered any technical or expert evidence to rebut Plaintiff's showing of a significant gap in coverage or the absence of feasible alternatives.

56. At the end of the First Hearing, Vertical Bridge's representatives reviewed with the ZBA, item by item, the additional information the ZBA needed to reach a decision, giving the ZBA a full opportunity to identify anything further it needed. The ZBA requested: (1) notice to be given to Hale's Location; (2) information on how coverage would be affected at lower heights; and (3) examples of monopine design alternatives. Vertical Bridge also volunteered to conduct a balloon test at locations to be identified by the ZBA, encouraged the ZBA to retain a third-party consultant to review the Application, and offered any assistance the ZBA needed.

57. Immediately after the First Hearing, Vertical Bridge contacted Town Planning Department staff to coordinate a balloon test and photosimulations. Once the Town identified the locations from which it wanted photographs taken, Vertical Bridge promptly scheduled and conducted the balloon test, which took place on August 4, 2026.

58. On July 13, 2026, Town Planning Department staff advised Vertical Bridge that the Town had engaged a consultant (the "Town Consultant") to review the special exception application and advise the ZBA on coverage, visual impact, radio frequency emissions safety, structural integrity, air navigation safety, and alternatives.

59. Despite Vertical Bridge's good faith efforts to work with Town Planning Department staff, it was evident that the ZBA sought to obstruct and delay its review of the Application. On July 15, 2026, 57 days after the Application was submitted and 27 days after the

deadline by which the Town was required to notify Plaintiff that the Application was incomplete under 47 C.F.R. § 1.6003(d)(2)(iii), the ZBA determined for the first time that the Application was incomplete so that "there is no concern about a time clock running out" on the ZBA. Then, on August 19, 2026, at a meeting at which the Application was not on the agenda, without notice to Plaintiff, and after the Application had already been continued to September 16, 2026, the ZBA discussed the Application and voted to require a second balloon float. Plaintiff had no opportunity to attend or be heard before that vote.

**First Supplemental Application**

60. On September 3, 2026, Plaintiff submitted a supplemental application addressing each of the issues the ZBA had raised (the "First Supplemental Application"), which included the following exhibits:

- Exhibit P: Photographic simulation report prepared by All-Points Technology Corporation;
- Exhibit Q: Letter regarding the balloon float and photosimulation;
- Exhibit R: Example photographs of monopine facilities;
- Exhibit S: Updated RF plots;
- Exhibit T: RF plots at ten-foot height intervals;
- Exhibit U: RF Plots Regarding the Proposed Artist Falls Road Wireless Communication Facility as an Alternate Site;
- Exhibit V: Plot Showing Terrain Profile from Artist Falls Tower to Route 302;
- Exhibit W: RF plots for the White Mountain Hotel and Resort rooftop as an alternate site;
- Exhibit X: Small-cell analysis prepared by Site Acquisition Specialist;
- Exhibit Y: Airspace study; and
- Exhibit Z: Updated site plan set.

61. In response to concerns raised by the ZBA and the public, Vertical Bridge evaluated whether the tower could feasibly be lowered and, in the First Supplemental Application, offered to reduce its height from 150 feet to 130 feet, accepting a loss of coverage to minimize visual impact. RF plots at ten-foot intervals showed that, due largely to a surrounding tree canopy averaging more than ninety (90) feet and the area's topography,

coverage and capacity diminish at lower heights. The 130-foot height is therefore the minimum needed to provide reasonably sufficient (albeit reduced) coverage and capacity in the search area.

62. As more fully set forth in the photographic simulation report (Exhibit P), photos were taken from 50 locations identified by the Town and Vertical Bridge's consultant. The Project was not visible from 36 locations, and of the 14 locations from which the Project would be visible, the Project did not block views of scenic vistas. Moreover, while visible from Cathedral Ledge, which is over a mile away from the Property, the photographic simulation report demonstrates that the tower would occupy only a small portion of the broad panoramic view and would not impact the surrounding mountain vistas.

63. The First Supplemental Application also evidenced that: (1) collocation on the Artist Falls Road tower would not remedy the Significant Gap; (2) a rooftop facility at the White Mountain Hotel and Resort would leave a substantial gap along Route 302; and (3) small cells or antennas on utility poles would not remedy the coverage and capacity deficiency, could not support collocation, and would require variances under the Code.

**Second Hearing**

64. Vertical Bridge's representatives presented the First Supplemental Application to the ZBA at its September 16, 2026 hearing (the "Second Hearing").

65. Vertical Bridge's consultant testified that, during the August 4, 2026 balloon float, a three-person team photographed each view the Town had requested, including the view from Cathedral Ledge. The consultant explained that the tower would not loom over Cathedral Ledge; rather, viewers would look down into the valley backed by pine trees, and the tower would not be a focal point from that location. The consultant further testified that despite the wind conditions and the first balloon rupturing, the float was successful: the balloon was aloft for

two (2) periods of approximately one hour and forty minutes each, and wind gusts lasted for only brief intervals, after which the balloon returned to its full test height.

66. In response to the ZBA's questions regarding alternatives, Verizon's radio frequency engineer presented a terrain profile demonstrating that the Artist Falls Road tower lacks line-of-sight to Route 302, the heart of the Significant Gap, and explained why small cells on utility poles are not a viable alternative, including the absence of backup power, the refusal of utility companies to permit their use, and a tree canopy that rises above the poles.

67. Vertical Bridge's counsel also walked the ZBA through each of the properties considered in its site selection process and explained why the Property is the only available and feasible site for the Project.

68. Public comment at the Second Hearing focused again on generalized opposition based on alleged impacts to viewsheds, property values, noise, and environmental concerns, together with anecdotal assertions that residents did not experience dropped calls. No member of the public submitted any technical or expert evidence rebutting Plaintiff's showing of a significant gap in coverage or the absence of feasible alternatives.

69. Despite testimony from Vertical Bridge's consultant that a second float would not produce new information, the ZBA voted 3-1 to request a second balloon float. One ZBA member conceded that the first float had served its purpose, that it had allowed Vertical Bridge's consultant to complete the photographic simulations, and that the record was complete, but nonetheless wanted a second float so that members of the public could see the balloon. When Plaintiff asked whether the ZBA might require a third or further float for the same reasons, the ZBA could offer no assurance that it would not.

**<u>Second Supplemental Application</u>**

70. On October 8, 2026, Plaintiff submitted a second supplemental application (the "Second Supplemental Application"), which included a letter to extend the shot clock to October 30, 2026 (Exhibit AA); a letter explaining the LiDAR-based tree canopy assessment (Exhibit BB); a letter from C Squared Systems, LLC responding to the Town Consultant's radio frequency questions (Exhibit CC); and an explanation of Corten steel as an alternative type of pole (Exhibit DD).

71. Through these exhibits, the Second Supplemental Application provided evidence that: (1) the trees on the Property average approximately 93 feet in height, ranging from approximately 43 to 125 feet; (2) the congestion at the Mt. Cranmore site is continuous, not seasonal; (3) no practical height of the Artist Falls Road tower would clear the intervening terrain (an estimated 450-foot tower would be needed to clear the terrain alone); (4) as requested by the ZBA, Verizon evaluated its existing rooftop installation known as "Bartlett E," which is located approximately three miles from the Property and four miles from the southern end of the Significant Gap, and is therefore too distant to provide additional coverage, even if modified; and (5) none of the alternatives would close the Significant Gap.

72. The Second Supplemental Application also reiterated that the Property is the only site available to address the coverage and capacity gap due to parcel size, floodplain, wetlands, and unresponsive or unwilling landowners.

73. Following a September 30, 2026 meeting with the Town Planner, Plaintiff also offered, at the ZBA's preference, to construct the monopole out of Corten steel, a weathering steel that develops a natural patina designed to help the structure blend into the surrounding foliage.

74. Plaintiff respectfully declined to conduct a second balloon float because the balloon had been aloft for a sufficient amount of time, the photographic simulation report would not change, and the ZBA had not identified any member of the public who was unable to observe the balloon.

**Third Hearing**

75. The Town Consultant presented his findings to the ZBA at its October 21, 2026 hearing (the "Third Hearing").

76. The Town Consultant confirmed that the RF information provided to the ZBA was accurate, properly prepared, and well represented, and that the need for this site is coverage-based. He also agreed that the Artist Falls Road tower would not provide coverage to West Side Road.

77. Vertical Bridge's representatives walked the ZBA through the information they had already provided in the record, testifying that collocating on the Artist Falls Road tower would not remedy the coverage gap and describing the thoroughness of the site selection process. The ZBA acknowledged that Plaintiff had identified and mailed letters to the property owners in and around the search area but received very few responses, and the Town Consultant acknowledged the limited number of available properties and the wetland constraints surrounding the Property.

78. Public comment at the Third Hearing continued to focus on the tower's visibility from homes, Cathedral Ledge, and the scenic road; the adequacy of the alternatives analysis; and anecdotal assertions that residents had not experienced gaps in coverage. As at the prior hearings, no member of the public submitted any technical or expert evidence rebutting Plaintiff's showing of a significant gap in coverage or the absence of feasible alternatives.

79. The ZBA then voted on each of the six special exception criteria under §§ 190-13K(12) and 190-13E(3). It found that five of the six criteria were satisfied: the proposed height was necessary for the facility to fulfill its function; regional-impact notice had been given; the facility would accommodate multiple providers; the ZBA was authorized to engage consultants at the applicant's expense; and major site plan approval must be obtained from the Planning Board.

80. However, notwithstanding the extensive and unrefuted evidence of need for the Project and of the absence of feasible alternatives, the ZBA found that Plaintiff had not demonstrated that every reasonable effort had been made to minimize visual impact, citing the limited properties reasonably considered and the failure to present a realistic analysis of multiple sites, and denied the special exceptions by a vote of 3-2.

**The Written Decision**

81. The Written Decision was issued on October 22, 2026 by the Town's Director of Planning & Development.

82. The Written Decision states a single reason for the denial: that "[s]ufficient evidence was not provided to meet the special exception criteria defined by §190-13K(12)(b)."

83. The ZBA "specifically found that every reasonable effort had not been made to demonstrate a realistic analysis of the proposal on multiple sites."

84. Vertical Bridge evaluated every alternative identified by the ZBA and submitted a written response evidencing why each alternative is not feasible.

85. The Written Decision does not identify any alternative site, existing structure, or facility type that Plaintiff failed to analyze, does not explain what further analysis would have satisfied the ZBA, and does not address the Site Selection Analysis or the alternate-site RF plots.

86. The denial ignores the facts in the record before it, is conclusory, and is not supported by any evidence in the written record.

87. The denial also constitutes an "effective prohibition" under the TCA.

**Irreparable Injury, Inadequacy of Damages, Public Interest, and Balance of Hardships**

88. Plaintiff has demonstrated the need for injunctive relief herein, including an order directing the ZBA to grant the special exceptions, the Planning Board to approve the site plan and record it in the Carroll County Registry of Deeds, and the Town to issue all necessary permits for the construction and operation of the Project.

89. As a result of the ZBA's actions, Vertical Bridge, Verizon, their customers, and the public will suffer irreparable harm absent the relief requested herein. The injury to Verizon affects: (i) its ability to provide emergency services, businesses, and the general public with access to the modern, reliable wireless network they need, expect, and rely upon; (ii) the full use of its existing FCC license and business investments; and (iii) its customer goodwill and business reputation. The injury to Vertical Bridge similarly affects the goodwill of its wireless provider customers and its business reputation.

90. The harm that Plaintiff has suffered and is suffering is not reasonably susceptible to accurate calculation and cannot be fully and adequately addressed through an award of damages.

91. Moreover, the public interest in promoting competition in the telecommunications arena and the rapid deployment of this evolving technology – the express goal of the TCA – has been irreparably harmed and will continue to be irreparably harmed by the Town's unlawful acts.

92. In addition, wireless telecommunications are an important component of public safety and emergency response systems and provide a vital alternative to traditional land lines

during times of public crisis. By preventing Plaintiff from constructing the Project, which is necessary to provide reliable wireless services, the Town is causing irreparable harm to the public with deprivation or delay of reliable emergency communications.

93. In contrast to the immediate and irreparable injury being suffered by Plaintiff, Verizon, and the public, the Town will suffer no significant injury if the Court issues the requested injunctive relief.

## Allegations Supporting Declaratory Relief

94. A present and actual controversy has arisen and now exists between the parties regarding their respective legal rights and duties. Defendants' actions are in violation of the TCA, and Plaintiff is entitled to all of the approvals necessary to proceed with the Project.

95. Plaintiff, Verizon, and the public have been and will continue to be adversely affected by the ZBA's unlawful acts and any further delay to the Project.

96. Accordingly, declaratory relief is appropriate and necessary to adjudicate the extent of Plaintiff's rights and the Town's duties and authority.

## COUNT I

### Violation of 47 U.S.C. § 332(c)(7)(B)(iii)—The ZBA's Denial Was Not Based on Substantial Evidence in the Written Record

97. Plaintiff realleges and incorporates by reference all preceding paragraphs.

98. Pursuant to 47 U.S.C. § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." (emphasis added).

99. No evidence in the record supports the Written Decision.

100. The ZBA's sole stated reason for denial was that Plaintiff had not made "every reasonable effort" to "demonstrate a realistic analysis of the proposal on multiple sites" under § 190-13K(12)(b). This finding is conclusory and is not supported by any evidence in the written record.

101. The written record contains a realistic analysis of multiple sites, including the Site Selection Analysis of six (6) parcels in or near the search area; the absence of any existing towers or tall structures suitable for collocation; RF plots and a terrain profile for the Artist Falls Road tower; RF plots for the White Mountain Hotel and Resort rooftop; and a small-cell analysis.

102. The record also demonstrates the need for the proposed height and Plaintiff's efforts to minimize visual impact: Plaintiff conducted a balloon float and submitted photographic simulations from 50 representative viewpoints; reduced the height from 150 feet to 130 feet; and offered monopine and Corten steel designs. The record further shows that the Project will not pollute, create noise or vibration, create any significant increase in traffic, create any environmental problems, increase population density, or create any demand on governmental facilities. The Written Decision does not cite any contrary evidence.

103. Plaintiff also provided extensive and unrefuted evidence of Verizon's significant coverage gap and lack of alternative feasible methods to satisfy that coverage gap. *See GMR Holdings of N.H., LLC v. Town of Lincoln, N.H.*, Case No. 21-cv-117-SM, 2021 WL 5177720, at *12 (D.N.H. Nov. 8, 2021) ("there is no suggestion in the record of any 'alternate siting locations' that would meet GMR's technical requirements <u>and</u> were available for lease <u>and</u> would satisfy the Planning Board's criteria, particularly given members' expressed opposition to any waiver of the fall zone requirement (which all other viable sites would require)").

104. The ZBA did not gather or submit any data to dispute Plaintiff's evidence. The Town Consultant did not identify any feasible alternative site and acknowledged that Plaintiff's coverage justifications were complete. *See T-Mobile Ne., LLC v. Town of Bedford, N.H.*, Case No. 17-cv-339-LM, 2018 DNH 234, 2018 WL 6201717, at *10 (D.N.H. Nov. 28, 2018) (finding that the carrier had met its burden to evaluate available alternatives and "[town] defendants have not identified any specific 'less sensitive' properties that plaintiffs overlooked").

105. The Written Decision disregards the factual evidence in the written record and rests instead on opinions that are speculative, unsupported by the evidence, and contrary to the substantial evidence in the record.

106. The written record does not contain substantial evidence that would lead an objective and reasonable person to deny the Application.

107. The Written Decision is in violation of and preempted by 47 U.S.C. § 332(c)(7)(B)(iii) and must be set aside and enjoined by the Court. Further, this Court should exercise its equitable power to issue an order that the Project is permitted at the Property and directing: (1) the ZBA to grant the special exceptions under §§ 190-13K(12) and 190-13E(3) of the Code; (2) the Planning Board to issue major site plan approval necessary for the construction of the Project within thirty (30) days of Plaintiff's submission of its site plan application and record it in the Carroll County Registry of Deeds; and (3) the Town to issue all other local permits and approvals required to construct and operate the Project.

## <u>COUNT II</u>

### Violation of 47 U.S.C. § 332(c)(7)(B)(i)(II)—Effective Prohibition

108. Plaintiff realleges and incorporates by reference all preceding paragraphs.

109. Pursuant to 47 U.S.C. § 332(c)(7)(B)(i)(II), "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." (emphasis added).

110. The First Circuit has established a two-step process for determining whether an effective prohibition has occurred. *Omnipoint*, 586 F.3d at 48–50; *Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 58 (1st Cir. 2012). First, a plaintiff must prove that the municipal defendant's action preventing construction of the proposed cell tower leaves a "significant gap" in coverage. *Vertex Towers*, 2026 WL 496983, at *4. Second, a plaintiff must also show that the proposed cell tower is "the only feasible plan" to remedy the gap. *Id.* (citations and internal quotation marks omitted). *See also Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 40 (1st Cir. 2014) (stating that a plaintiff will prevail on an "effective prohibition" claim pursuant to § 332(c)(7)(B)(i)(II) if it shows that local authorities have rejected the only feasible plan to close a gap in coverage and "further reasonable efforts [to find another solution] are so likely to be fruitless that it is a waste of time even to try."); *Town of Amherst, N.H. v. Omnipoint Commc'ns Enters., Inc.*, 173 F.3d 9, 14 (1st Cir. 1999) ("If the criteria or their administration effectively preclude towers no matter what the carrier does, they may amount to a ban 'in effect' even though substantial evidence will almost certainly exist for the denial.").[1]

[1] *But see Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, Declaratory Ruling and Third Report and Order, 33 FCC Rcd. 9088 (2018), in which the FCC concluded that the effective prohibition analysis should consider not only gaps in coverage but also the need to add network capacity, because most new wireless builds, including small cells serving in-building use, are designed to deploy new technologies and increase network capacity. The First Circuit has not had occasion to address this declaratory ruling. *Vertex Towers, LLC v. Zoning Bd. of Adjustment of Town of Hampton, N.H.*, 2026 WL 496983, at *4 (D.N.H. Feb. 23, 2026). However, it is relevant in this case because the Project is designed both to close the Significant Gap and to relieve Verizon's surrounding sites that are operating at or near capacity.

111. Plaintiff firmly and irrefutably established that a significant coverage gap exists in the Mt. Cranmore 2 NH Cell.

112. First, the RF Report enclosed as Exhibit F to the Application demonstrated Verizon's significant coverage and capacity gap in Conway. Verizon's existing wireless facilities do not provide sufficient coverage to this area due, in large part, to the distance between existing sites, intervening topography, and the volume of user traffic. As detailed in the Application, this gap affects Route 302 (White Mountain Highway), which carries approximately 17,000 vehicles per day; West Side Road, which carries approximately 3,700 vehicles per day; and River Road, which carries approximately 4,500 vehicles per day, as well as the surrounding roads, neighborhoods, and businesses near the Property.

113. Second, Attachments A and C to the RF Report illustrate the extent of this gap. In these propagation maps, areas depicted in white have poor service quality, low data throughput, and a substantial likelihood of unreliable service. Green indicates coverage greater than -85 dBm, yellow indicates coverage between -85 dBm and -95 dBm (Verizon's minimum targeted threshold for this area), and grey indicates coverage between -95 dBm and -105 dBm. As shown in both attachments, portions of Conway are in areas of deficient 700 MHz LTE and 2100 MHz LTE coverage, below the threshold necessary for Verizon to provide reliable service to the Mt. Cranmore 2 NH Cell. *See New Cingular Wireless PCS, LLC v. City of Manchester, N.H.*, 2014 WL 799327, at *2–3 (D.N.H. 2014) ("In finding that a significant coverage gap exists, the court has considered factors such as the physical size of the gap, the number of users the gap affects, percentages of unsuccessful calls or inadequate service during calls in the gap area, the need for coverage around a heavily traveled and important route, and the carrier's standard for reliable service to satisfy customers based on signal levels. Lack of reliable in-building coverage is also a

relevant consideration. Reliable in-building coverage is essential to consumers and carriers.") (internal citations omitted).

114. Third, the RF Report demonstrated that the Project would relieve capacity burdens on Verizon's surrounding sites, offloading approximately 28% of residential and 40% of employee population served by the Mt. Cranmore gamma sector and approximately 32.8% of residential and 40.9% of employee population served by the Bartlett E beta sector.

115. Plaintiff also established that no feasible alternatives exist to close the coverage gap other than the Project.

116. No existing towers or tall structures suitable for collocation are located within or near the search area, nearly 75% of the search area lies within the floodplain overlay, and the other parcels identified in the search area were unavailable due to floodplain and wetland constraints, existing uses, or owners who declined or did not respond.

117. As demonstrated in the Application and set forth in paragraph 49 above, the Property is well suited for a new tower.

118. Plaintiff also analyzed each alternative raised by the ZBA. Collocation on the Artist Falls Road tower would not close the gap because no practical height would clear the intervening terrain; a rooftop facility at the White Mountain Hotel and Resort would leave a substantial gap along Route 302; small cells or antennas on utility poles would not remedy the coverage and capacity deficiency, could not support collocation, and would require variances under the Code; and none of the alternatives studied would close the Significant Gap.

119. Neither the ZBA nor the Town Consultant identified any feasible alternative site. *See GMR Holdings of N.H., LLC*, 2021 WL 5177720, at *9 (D.N.H. 2021) (rejecting town's argument that a site was a viable alternative, even though it required the same fall zone waiver as

the proposed site, because members of the Planning Board had strongly opposed granting any such waiver); *New Cingular Wireless PCS, LLC*, 2014 WL 799327, at *4 (D.N.H. 2014) ("To the extent the City 'could prefer other solutions on aesthetic grounds,' it has failed to specifically identify any such feasible alternative solution").

120. Instead, the ZBA denied the Application on the ground that Plaintiff had not made "every reasonable effort" to analyze multiple sites, yet the ZBA itself identified no feasible alternative. In effect, the ZBA faulted Plaintiff for failing to analyze sites that the ZBA could not name. Moreover, to the extent the denial rested on the Project's potential visibility from Cathedral Ledge, any site within the search area would be equally visible from Cathedral Ledge and the other vantage points raised by the public.

121. Plaintiff provided extensive and unrefuted evidence that there is a significant gap in coverage in the Mt. Cranmore 2 NH Cell and there are no feasible alternatives to close the gap in coverage other than the Project. The ZBA's denial therefore constitutes an effective prohibition in violation of § 332(c)(7)(B)(i)(II) of the TCA. The Written Decision must be set aside and enjoined on that basis.

122. Further, this Court should exercise its equitable power to issue an order that the Project is permitted at the Property and directing: (1) the ZBA to grant the special exceptions under §§ 190-13K(12) and 190-13E(3) of the Code; (2) the Planning Board to issue major site plan approval necessary for the construction of the Project within thirty (30) days of Plaintiff's submission of its site plan application and record it in the Carroll County Registry of Deeds; and (3) the Town to issue all other local permits and approvals required to construct and operate the Project.

## COUNT III

**Violation of 47 U.S.C. § 253(a)–The Town's Administration of the Code, as Applied to the Application, is an Effective Prohibition of Service**

123. Plaintiff realleges and incorporates by reference all preceding paragraphs.

124. 47 U.S.C. § 253(a) provides that "[n]o state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." *See also ExteNet Sys., Inc. v. City of Cambridge*, 481 F. Supp. 3d 41, 56 (D. Mass. 2020) ("In the First Circuit, a plaintiff may meet its burden of demonstrating that a regulation effectively prohibits its ability to provide wireless services by showing the mere possibility of an effective prohibition, rather than by showing an actual effective prohibition.").

125. Where a board administers an open-ended criterion such as the "realistic analysis of multiple sites" requirement of § 190-13K(12)(b) in a manner that no applicant could satisfy, regardless of the evidence presented, the criterion operates as a ban on the facility. *See Town of Amherst*, 173 F.3d at 14 ("Suppose, for example, that in denying an individual permit, the town zoning authority announces that no towers will ever be allowed or sets out criteria that no one could meet. The fact that the ban is embodied in an individual decision does not immunize it . . . . If the criteria or their administration effectively preclude towers no matter what the carrier does, they may amount to a ban 'in effect' even though substantial evidence will almost certainly exist for the denial.").

126. Here, Plaintiff analyzed six (6) parcels in or near the search area, the Artist Falls Road tower, the White Mountain Hotel and Resort rooftop, and Bartlett E; explored small-cell and utility-pole alternatives; reduced the tower height by twenty (20) feet; and offered both a monopine and a Corten steel design. The ZBA nonetheless found the site analysis insufficient

without identifying any additional site to be analyzed. The Code cannot be interpreted to require an applicant to review every possible option, including those that are unreasonable or infeasible, in order for an application to be approved. *See Indus. Commc'ns & Elecs., Inc. v. Town of Alton*, 2012 WL 4343759, at *25 (D.N.H. 2012) ("[T]he court of appeals has placed the burden on a carrier who brings an effective prohibition claim arising out of a single denial to show that the carrier 'investigated thoroughly the possibility of other *viable* alternatives,' not all other *conceivable* alternatives.").

127. Moreover, the Town's burdensome procedures have effectively barred the deployment of telecommunications service in Conway. The ZBA continued the Application across three (3) public hearings over five (5) months; voted, at an off-agenda meeting without notice to Plaintiff, to ask for a second balloon float; renewed that request at the Second Hearing despite the record being complete; and took over one hundred fifty (150) days to render its decision alone, necessitating an extension of the FCC shot clock before the Planning Board had the opportunity to review the site plan. This procedural course placed the Application in indefinite administrative limbo, contrary to the requirements of the TCA.

128. The ZBA's administration of § 190-13K(12)(b) and the Town's application review process have the effect of prohibiting Verizon from providing interstate and/or intrastate telecommunications service in Conway and are in violation of, and preempted by, § 253(a) of the TCA and must be set aside and enjoined on that basis. Further, this Court should exercise its equitable power to issue an order that the Project is permitted at the Property and directing: (1) the ZBA to grant the special exceptions under §§ 190-13K(12) and 190-13E(3) of the Code; (2) the Planning Board to issue major site plan approval necessary for the construction of the Project within thirty (30) days of Plaintiff's submission of its site plan application and record it in the

Carroll County Registry of Deeds; and (3) the Town to issue all other local permits and approvals required to construct and operate the Project.

**WHEREFORE**, by reason of the foregoing Counts, Plaintiff respectfully requests entry of a judgment and order as follows:

1. GRANTING expedited review of the matters set forth in this Complaint pursuant to 47 U.S.C. § 332(c)(7)(B)(v).

2. On the First Count, a judgment DECLARING that the Written Decision was illegal as it was not based on substantial evidence contained in the written record in violation of the TCA. Further, this Court should exercise its equitable power to ORDER: (1) the ZBA to grant the special exceptions; (2) the Planning Board to issue major site plan approval necessary for the construction of the Project within thirty (30) days of Plaintiff's submission of its site plan application; (3) the Planning Board to record the site plan in the Carroll County Registry of Deeds; and (4) the Town to issue all other local permits and approvals required to construct and operate the Project.

3. On the Second Count, a judgment DECLARING that the ZBA has effectively prohibited the provision of personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) of the TCA and the Written Decision is therefore void and invalid. Further, this Court should exercise its equitable power to ORDER: (1) the ZBA to grant the special exceptions; (2) the Planning Board to issue major site plan approval necessary for the construction of the Project within thirty (30) days of Plaintiff's submission of its site plan application; (3) the Planning Board to record the site plan in the Carroll County Registry of Deeds; and (4) the Town to issue all other local permits and approvals required to construct and operate the Project.

4. On the Third Count, a judgment DECLARING that the ZBA's administration of § 190-13K(12)(b) of the Code and the Town's review process, as applied to the Application, effectively prohibited the provision of telecommunications service in violation of 47 U.S.C. § 253(a) of the TCA. Further, this Court should exercise its equitable power to ORDER: (1) the ZBA to grant the special exceptions; (2) the Planning Board to issue major site plan approval necessary for the construction of the Project within thirty (30) days of Plaintiff's submission of its site plan application; (3) the Planning Board to record the site plan in the Carroll County Registry of Deeds; and (4) the Town to issue all other local permits and approvals required to construct and operate the Project.

5. AWARDING Plaintiff its costs, expenses, and attorneys' fees, together with such other and further relief as the Court deems just and proper.

Respectfully submitted,

**THE TOWERS, LLC d/b/a VERTICAL BRIDGE**

Dated: November 19, 2026

By and through counsel,

**NIXON PEABODY LLP**

By: */s/ Daniel Deane*
Daniel Deane (NH Bar #18700)
900 Elm Street, 14th Floor
Manchester, NH 03101-2031
(603)-628-4047
(866)-947-1243
ddeane@nixonpeabody.com

*Attorneys for Plaintiff*